534 P.2d 743

**STATE of Arizona, Appellee,**

v.

**Jose Guadalupe Morales BECERRA and Jose Manuel Zamarripa, Appellants.**

**No. 2964.**

Supreme Court of Arizona,
In Banc.

May 1, 1975.

N. Warner Lee, Atty. Gen., by Shirley H. Frondorf, Phoenix, for appellee.

Emery E. Varga, Yuma, for appellant Zamarripa.

B. L. Helm, Yuma, for appellant Becerra.

STRUCKMEYER, Vice Chief Justice.

This is a consolidated appeal from convictions for possession of marijuana for sale. Judgments affirmed.

### THE APPEAL OF JOSE MANUEL ZAMARRIPA

Appellant Jose Manuel Zamarripa, co-defendant of appellant Jose Guadalupe Morales Becerra, was tried and convicted on a charge of transportation of marijuana and possession of marijuana for sale. The trial judge set aside the conviction for transportation of marijuana for the stated reason that it was his desire to equalize any sentences to be imposed. Zamarripa's ground for reversal here is that the trial court erroneously denied his motion to suppress evidence for the reason that a search of his vehicle was illegal and the seizure of the marijuana contained in it was evidence unlawfully obtained under the Fourth Amendment to the Constitution of the United States.

The seizure of the marijuana arose in this manner. Marcus H. Higgins, an officer in the United States Border Patrol stationed at Tacna, Arizona, was charged with the duty of apprehending illegal entrants into this country. Pursuant to those duties, he was parked about 7:30 a. m., observing traffic near Milepost 41 on Interstate 8 about 40 miles east of Yuma, Arizona. Interstate 8 is the only road north of the Mexican border running east and west between Yuma and Gila Bend, Arizona, a distance of approximately 120 miles. Higgins' vehicle was pulled off the road onto the median between the two traffic lanes when he noticed the approach of a 1960, white Chevrolet automobile in which Becerra was riding and Zamarripa was driving. The automobile was traveling east, away from Yuma, and at this point was approximately 30 miles north of the Mexican border. It was, in point of fact going to Phoenix.

Higgins testified that the border patrol looks for certain types of vehicles that might be loaded and that the back end of the 1960 Chevrolet in which Zamarripa and Becerra were traveling was "real low" to the ground. The apparent nationality of the occupants was Mexican. Higgins stopped the vehicle and talked to the driver, Zamarripa, who convinced him that he was an American citizen. Higgins then talked to Becerra and learned that he was a Mexican National, but that he had a local crossing card. The holder of such card can cross the border and stay for a period of 72 hours in the United States. He must, however, stay within 25 miles of the border. The point where Higgins intercepted the Chevrolet was approximately 30 miles north of the border. When an individual is found who has exceeded the limits of such a card, Higgins' duty is to take that person into custody. Zamarripa was

told by Higgins that he wanted to look in the trunk of the car. In the trunk were 485 pounds of marijuana. Higgins placed both Becerra and Zamarripa under arrest and had Zamarripa drive the Chevrolet to the border patrol office in Tacna, where the Arizona State Drug Enforcement Administration was called, with the resulting prosecution in Yuma County, Arizona.

Higgins also testified that he had been working for the border patrol for a little over two years and in that time had probably apprehended in excess of a thousand aliens; that ten or fifteen times he found aliens in the trunks of cars and sometimes there might be more than one person in the trunk. He testified at an omnibus hearing on Zamarripa's motion to suppress:

"Q. And the pattern, or what you observed on this particular morning, did this fit the pattern of what you have learned from your experience as to how aliens are smuggled, and picking out people out of a group of cars to check? You don't just indiscriminately check everybody, do you?

A. No, sir.

Q. You have certain things and factors in your mind that you have learned through experience at doing this that kind of make a little light go on or a bell ring in your mind that it says these people fit a profile or a pattern, these people should be checked for their citizenship status, is that correct?

A. Right."

Geographically, Interstate 8 between Yuma and Gila Bend passes through a remote part of the country in which it is possible for aliens to cross the International Boundary, particularly at night, on foot, and meet prearranged transportation. · See, e. g., Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

We do not understand that Milepost 41 was a fixed checkpoint stop, but was more in the nature of a roving patrol stop; nor is it claimed that the border patrol had a search warrant or that Higgins was acting other than pursuant to the powers found in the United States Code, Title 8, § 1357.

We note that Higgins did not testify that he would not have searched the Chevrolet if he had found that both occupants were American citizens. Nor did he testify that the determination of Becerra's status induced him to search the vehicle. We therefore treat the stop and search as a single continuous incident without regard to whether the determination of Becerra's alien status justified the search after the stop. Nevertheless, we hold the search was lawful under the Fourth Amendment to the Constitution of the United States.

Congress has provided that any Immigration officer or employee shall have the power without warrant to search any vehicle for aliens within a reasonable distance from any external boundary of the United States. Section 287(a)(3) of the Immigration Nationality Act, U.S. Code, Title 8, § 1357. The Supreme Court of the United States in Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), has construed Congress' Act to mean that the language of the statute is circumscribed by the constitutional requirement of probable cause as recognized in Carroll v. United States, *supra,* and the subsequent cases cited and distinguished in Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

An experienced border patrol officer could conclude from the above stated facts that a stop and search of the Zamarripa vehicle could be lawfully undertaken. First, the area was important. Aliens can walk across the border and meet prearranged transportation in the farming area south of Yuma. Second, the time of day was significant. Aliens who illegally cross the International Boundary at night and on foot must find cover with the coming of daylight or risk of discovery becomes an almost certainty. Ideally, the arrangements would be to meet transportation to metropolitan areas at or shortly before dawn. Third, there is a high degree of probability that transportation arrange-

ments would be made with individuals with whom the aliens would be most likely to place their trust, that is, Mexican Nationals and Americans of Mexican extraction. And, finally, the significant facts that aliens are often transported in the trunk of an automobile and that the rear of this Chevrolet automobile was low to the ground.

The combination of these circumstances establishes a profile sufficent to sustain the stop and search. We therefore conclude that this was not an indiscriminate stop without probable cause, but a reasonable search permitted by the Constitution. Finding no error in the trial court's ruling that the search of the vehicle was legal and the seizure of the marijuana was not unlawful, the judgment is affirmed.

## THE APPEAL OF JOSE GUADALUPE MORALES BECERRA

 The appellant Becerra plead guilty to the charge of possession of marijuana for sale and received a sentence of two to three years in the State Penitentiary. He presents the single question of whether the failure of the trial court to grant probation was an abuse of discretion. Subsidiary to this question and underlying his argument is the thesis that the court below was under an obligation to spell out its reasons for granting or denying probation.

Appellant points to the Standards Relating to Appellate Review of Sentences of the American Bar Association, Approved Draft § 2.3(c), which provides that the sentencing judge shall make a statement of his reasons for selecting the sentence imposed. It is urged that if we require the sentencing court to state his reasons, an appellate court will both be able to review the sentence and provide courts and attorneys in Arizona definitive guidelines to specify which circumstances are aggravating and which are mitigating.

We have previously touched upon this issue in State v. Douglas, 87 Ariz. 182, 349 P.2d 622 (1960). There, we noted that the Legislature has not required the trial judge to spell out its reasons for either granting or denying probation. We said:

"Probably this was because there are so many intangible and imponderable factors entering into such a decision." 87 Ariz. at 187, 349 P.2d at 625.

We decline to find reversible error in the trial judge's failure to state his reasons for refusing to grant probation or imposing the particular sentence ordered in the case. The trial judge has had the opportunity to see and hear the defendant and the witnesses in the case and knows the local conditions. He has the necessary feel to impose a just sentence in assessing the intangibles and imponderables. We do not think it is necessary for our views to coincide with his. We therefore do not propose to second-guess him in such matters and will not disturb the sentence unless it appears that it is grossly excessive.

In the instant case, appellant, after pleading guilty, testified at a mitigation hearing that he was to share in the proceeds of the sale of the 485 pounds of marijuana which were found in the automobile in which he was riding. Such patent defiance of the laws of this State fully justifies the modest sentence imposed. The judgment of conviction and sentence are affirmed.

CAMERON, C. J., and LOCKWOOD, HAYS and HOLOHAN, JJ., concur.