534 P.2d 441
**STATE of Arizona, Appellant,**

v.

**Raymond Arcadio OCHOA, Appellee.**

**No. 2 CA–CR 498.**

Court of Appeals of Arizona,
Division 2.

April 29, 1975.

Rehearing Denied June 3, 1975.

Review Granted Sept. 18, 1975.

———◆———

Dennis DeConcini, Pima County Atty. by Karen Nash, Deputy County Atty., Tucson, and Edward C. Vincent, Certified Third-Year Law Student Under Rule 28(e), for appellant.

John M. Neis, Pima County Public Defender by Lindsay E. Brew, Asst. Public Defender, Tucson, for appellee.

## OPINION

HOWARD, Chief Judge.

This appeal poses two issues for our resolution: First, whether law enforcement agents may stop an automobile to check its registration and the license of its driver without any indication that a statute has been violated; second, does the stolen motor vehicle profile arm a law enforcement officer with reasonable suspicion of criminal conduct to justify the stopping of an automobile?

During the early morning hours of July 27, 1974, a stolen motor vehicle task force, manned by members of the Tucson Police Department, the Phoenix Police Department, the FBI, the Arizona Department of Public Safety and the Pima County Sheriff's Office, were patrolling U. S. Highway 89. Detective Rotsteen, working as a spotter, observed appellee's vehicle and noted that it matched the stolen motor vehicle profile. He ordered that the vehicle be stopped. Detective Stinchfield stopped appellee's 1973 Ford pickup truck so that Stinchfield could check the truck's registration to determine if it was stolen. He requested that appellee shut off the ignition so that the engine noise would not interfere with their conversation. Stinchfield observed that appellee had trouble

doing so until he manipulated a second ignition switch hanging under the dashboard. Aware that a second ignition switch is commonly used to start stolen vehicles, Stinchfield asked appellee where he got the truck. Appellee replied that he had stolen it in Tucson.

Appellee was indicted for a violation of A.R.S. § 13–672, theft of a motor vehicle. He filed a motion to suppress which the court below granted because "the profile used by the police officers to stop vehicles on the road does not constitute reasonable suspicious circumstances justifying a stop."

Our analysis of Arizona cases concerning the right of law enforcement agents to stop motorists to check their driver's licenses and the vehicle registration leads us to the conclusion that there is a fundamental split between the two divisions of the Court of Appeals. In State v. Ream, 19 Ariz.App. 131, 505 P.2d 569 (1973), Division One accepted the argument that:

> " 'The mere fact that a car is operating on the highway may be sufficient reason for police to check and see if the car is lawfully registered and licensed. The test is one of balancing the interests and needs of the state in its monumental task of regulating the highway and motor vehicles against the fleeting and minimal inconvenience suffered by motorists during the strictly limited stops.' " 19 Ariz.App. at 133, 505 P.2d at 571.

In contrast, this Division declared in State v. Taras, 19 Ariz.App. 7, 504 P.2d 548 (1972), that:

> " 'There must be a rational suspicion by the police officer that some activity out of the ordinary is or has taken place, some indication to connect the person under suspicion with the unusual activity, and some suggestion that the activity is related to crime. [Citation omitted]' [17 Ariz.App. 441] 498 P.2d [515] at 522
>
> We believe that the above test should apply not only to a situation such as in *Baltier,* but also to force stops of vehicles." 19 Ariz.App. at 10, 504 P.2d at 551 (Footnote omitted)

Ultimately this conflict must be resolved by our Supreme Court.[1] In lieu of such a resolution, we will continue to follow our decision in *Taras* and proceed to an explanation of its rationale.

■ We must first determine whether the Fourth Amendment is applicable to stops of motor vehicles. The issue appears self-answering. The Fourth Amendment proscribes unreasonable seizures. The United States Supreme Court has defined the seizure of a person to occur "whenever a police officer accosts an individual and restrains his freedom to walk away". Terry v. Ohio, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). There can be no doubt that in this case appellee was seized. Appellee had no right "to avoid" the police officer; he had no "right to ignore his interrogator and walk away . . . ." Id. at 32–33, 88 S.Ct. at 1886 (Harlan, J. concurring). Instead, as Detective Stinchfield testified, appellee could not have elected to drive off. His freedom to drive away having been restrained, appellee was seized, and the strictures of the Fourth Amendment came into play.

■ Was this seizure reasonable is the question to be resolved. In assessing the reasonableness of a search or seizure we must first consider the nature and extent of the governmental interests involved. We can perceive three interests which the government may allege are involved: first, the interest of protecting motorists from unsafe drivers; second, the interest of enforcing the state's registration and licensing statutes; and third, the general interest of effective crime prevention and detection. We do not believe that any of these interests justifies imposition of a requirement less stringent than that of reasonable suspicion. Any other holding would raise a specter over this state potentially as forboding as Solzhenitsyn's "Gulag Archipelago".

Regarding the first interest, there is no inherent connection between the safe operation of a motor vehicle and the possession of a vehicle registration or a driver's license. As the Supreme Court of California noted:

"Finally, it bears remembering that section 4454 is essentially a regulatory measure and does not protect the public from either dangerous driving or unsafe equipment." People v. Superior Court, 7 Cal.3d 186, 193–94, 101 Cal.Rptr. 837, 842, 496 P.2d 1205, 1210 (1972).

This observation is particularly meritorious in a situation such as the case at bar where there was no hint that a motor vehicle statute was being violated. Compare, State v. Sergheyev, 534 P.2d 302 (Ariz. App. 1975). In addition, this interest is nothing more than a specialization of the general enforcement interest and should be governed by the standards controlling law enforcement in general.

The rationale behind the second interest is that the only way the state's registration and licensing statutes can be enforced is to permit motor vehicle stops without requiring any reasonable suspicion. It is clear that there is not necessarily any outward manifestation of criminal conduct when the registration or licensing statutes are violated. Yet to permit this argument to be used to justify arbitrary stops such as the one involved here would bode ominous consequences.

An example will illustrate one possible consequence of such a holding. Under 50 U.S.C.A. App. § 453, it is the duty of every male citizen of the United States between the ages of eighteen and twenty-six to register in the Selective Service System. Pursuant to 32 C.F.R. § 1641.6(a) (1973) every person who registers with Selective Service must have in his personal possession his registration certificate and his notice of classification or his status card. It

I. Our split is not unique. Compare, Lipton v. United States, 348 F.2d 591 (9th Cir. 1965) and United States v. Leal, 460 F.2d 385 (9th Cir. 1972), cert. denied 409 U.S. 889, 93 S.Ct. 154, 34 L.Ed.2d 146.

is a crime, punishable by a fine of no more than $10,000 or imprisonment for not more than five years, or both, not to possess the required cards. 50 U.S.C.A. App. § 462(b)(6). See, United States v. Demangone, 456 F.2d 807 (3d Cir. 1972), cert. denied 407 U.S. 914, 92 S.Ct. 2435, 32 L. Ed.2d 689. Just as is the case with driver's licenses and motor vehicle registrations, there is no way of assuring strict compliance with this provision of the Selective Service laws except to permit citizens to be arbitrarily stopped on the street and ordered to produce the required cards. Yet it would boggle the imagination to contend that the framers of the Constitution intended that the Fourth Amendment would permit such police state tactics. Similarly, we cannot see how the Fourth Amendment can permit motor vehicle stops to check for proper registration and license without any indication of criminal conduct.

Finally, there is the state interest in effective crime prevention and detection. As are the other two, this is a valid state interest. The question arises, however, whether this interest will permit a stop without even reasonable suspicion. The Supreme Court of the United States answered "no" to this question in Terry v. Ohio, supra.

"One general interest is of course that of effective crime prevention and detection; it is this interest which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22, 88 S.Ct. at 1880.

Recognizing this as a valid interest, the Supreme Court nonetheless held that the seizure of a person was only reasonable "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that crimi-

nal activity may be afoot . . . ." 392 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 U.S. at 30, 88 S.Ct. at 1884. Most recently, in Almeida-Sanchez v. United States, (1973), the Supreme Court of the United States rejected the Lorelei-like lure of police expediency. It noted:

"The Court that decided Carroll v. United States, supra, [267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543] sat during a period in our history when the Nation was confronted with a law enforcement problem of no small magnitude—the enforcement of the Prohibition laws. But that Court resisted the pressure of official expedience against the guarantee of the Fourth Amendment. Mr. Chief Justice Taft's opinion for the Court distinguished between searches at the border and in the interior, and clearly controls the case at bar:

'It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor, and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.' 267 U.S., at 153–154, 45 S.Ct., at 285." 413 U.S. at 274–75, 93 S.Ct. at 2540.[2]

Therefore, we must conclude that forced stops of motor vehicles are only constitutional where there is a rational suspicion

---

2. As is clear from our holding, we do not mean to imply that probable cause is required, as the meaning of *Carroll* must be regarded as having been modified by cases such as *Terry*.

by the police officer that some activity out of the ordinary is or has taken place, some indication to connect the person under suspicion with the unusual activity, and some suggestion that the activity is related to crime. See, United States v. Mallides, 473 F.2d 859 (9th Cir. 1973). Accord, United States v. Bell, 383 F.Supp. 1298 (D.Neb. 1974); Commonwealth v. Swanger, 453 Pa. 107, 307 A.2d 875 (1973). In so holding, we are merely reiterating the words of the Supreme Court of the United States in Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) in a different context.

> "Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" 394 U.S. at 726–27, 89 S.Ct. at 1397. [Footnote omitted]

■ We must therefore proceed to an examination of the stolen motor vehicle profile to determine whether it supplied the stopping officers with sufficient rational suspicion. We agree with the conclusion of the court below that the profile does not constitute reasonably suspicious circumstances justifying a stop.

The profile, a product of a May, 1974 meeting of various law enforcement agencies, is an attempt to stem a crime problem in which hundreds of thousands of dollars worth of cars were stolen in recent years. Vehicles which fit the profile are all 1972–74 Ford and Chevrolet full-size and intermediate sedans and 1972–74 Ford, Chevrolet, GMC and Dodge pickup trucks. Drivers who fit the profile must be between 17 and 27 years of age. In an effort to avoid stopping innocent families and tourists, only vehicles with Maricopa or Pima County license plates, which had neither children nor visible luggage, were stopped.

■ It is clear that in certain circumstances a profile may be used to create reasonable suspicion which would justify a temporary investigative seizure. See, e. g., United States v. Lopez, 328 F.Supp. 1077 (E.D.N.Y.1971). In *Lopez,* the court held that a person meeting the airline skyjacker's profile could constitutionally be stopped. The profile used in that case consisted of nine or ten characteristics which could "be easily observed without exercising judgment." Id. at 1086. Substantially less than one percent of the general population which boarded airliners met the profile and more than 90% of the hijackers conformed to its characteristics. Comparing the stolen motor vehicle profile with this approved profile illustrates the former's serious shortcomings.

The stolen motor vehicle profile suffers from four defects. First, it was never meant to isolate which cars might be stolen —the use to which it has been put. The following testimony by Sergeant Cutrona of the Phoenix Police Department illustrates this fact:

> "Q. So we don't have any way of saying that your figures show a profile vehicle is more likely to be stolen than a non-profile vehicle?
>
> A. I am not saying that one is more likely to be stolen than another one. I am saying this particular type of vehicle, when it is stolen, is going to a particular place."

In other words, the profile was not meant to provide reasonable suspicion that a vehicle was stolen; it was only developed to show that if a vehicle was stolen, it would be transported to Mexico.

Second, the record is devoid of any evidence of the profile's accuracy. To prove that the profile is more accurate than random automobile stops it would be necessary to compare two computations: first, the percentage of stops that resulted in stolen motor vehicle arrests and second, the proportion of registered vehicles which are stolen. Those statistics which are in the record point up the profile's inadequacy.

Sergeant Cutrona testified that in the first five months of 1974 approximately 4,000 motor vehicles were stolen, of which 222 were profile vehicles. During this period, therefore, roughly 5.6 percent of the vehicles stolen matched the profile. In 1973, 6,000 vehicles were stolen and only 151 were profile vehicles—a rate of 2.5 percent. The fact that 90 percent of the airplane hijackers matched the skyjacker profile, United States v. Lopez, supra, 328 F. Supp. at 1086, illustrates the grievous deficiency of the stolen motor vehicle profile.

Third, the profile is overbroad. Neither appellant nor appellee established at the suppression hearing the number of vehicles on the highways which match the profile's characteristics. At least as far as pickup trucks are concerned, the profile does not appear to be too selective. It covers all late model pickup trucks manufactured in the United States with the exception of those manufactured by International. Regarding automobiles, the profile would not seem from everyday observation, to achieve much higher marks. Again, we are operating in the dark because neither party provided us with any statistics; however, it seems obvious that the profile comes nowhere close to approximating the below one percent selectivity rate of the airline hijacker profile.

■ Finally, the stolen motor vehicle profile requires too much exercise of independent judgment on the part of the law enforcement officer. This defect is most visible with regard to the age limits of the drivers meeting the profile. How is a police officer to determine whether a driver is 27 or 30 or 35? One man's 27 year-old is another's "trentagenarian". In addition, there appears to have been confusion over what vintage vehicle met the profile. At one point, Sergeant Cutrona testified as follows:

"Q. Sergeant Cutrona, in the course of the investigation into this matter as far as Phoenix auto thefts are concerned did you have occasion to determine what kinds of vehicles are stolen in Phoenix to determine whether or not there is one kind that is stolen more than another?

A. Yes. In regards to the vehicle going to Mexico, yes.

Q. What kind of vehicles are those?

A. These are the ones I described as a 1972–74 Ford and Chevy sedans, 1972–74 Ford, Chevy, GMC and Dodge pickups."

Yet, on other occasions, Sergeant Cutrona testified as follows:

"Q. * * * You indicated, just for starters, that we had Ford, Chevy, Dodge or GMC trucks, 1970 or later vintage were in the profile vehicle classified, is that correct?

A. 1970 or later, right."

If a profile has any statistical validity, it must be definite enough to exclude excessive use of independent judgment. The stolen motor vehicle profile does not do so.

Because the stop of appellee's vehicle was unconstitutional, the lower court was correct in granting the motion to suppress.

Affirmed.

KRUCKER, J., concurs.

HATHAWAY, Judge (dissenting).

On authority of State v. Ream, 19 Ariz. App. 131, 505 P.2d 569 (1973), I would reverse.

The majority's attempted explanation of the rationale of State v. Taras, supra, seems a rather useless exercise bearing in mind we there dealt with and upheld as justifiable a search made during an investigatory detention founded upon a rational suspicion.