544 P.2d 1097

**The STATE of Arizona, Appellant,**

v.

**Raymond Arcadio OCHOA, Appellee.**

**No. 3274–PR.**

Supreme Court of Arizona,
In Banc.
Jan. 14, 1976.

Rehearing Denied Feb. 18, 1976.

Dennis DeConcini, Pima County Atty., Tucson by Karen Nash, Tucson, Edward C. Vincent (3rd year law student), for appellant.

John M. Neis, Pima County Public Defender by Lindsay E. Brew, Tucson, for appellee.

STRUCKMEYER, Vice Chief Justice.

Appellee, Raymond Arcadio Ochoa, was indicted for the theft of a 1973 Ford pickup truck. From an order suppressing all evidence obtained from the asserted wrongful stopping of the Ford truck which Ochoa was driving, the State has appealed. The Court of Appeals affirmed. We granted review. *Opinion of the Court of Appeals,* 23 Ariz.App. 510, 534 P.2d 441 (1975), vacated, and the judgment of the Superior Court reversed.

At about six o'clock A.M. on July 27, 1974, Ochoa was driving south on U. S. 89 between Tucson and Nogales, near Milepost 26, when he was stopped by Patrolman Luis Chaboya of the Department of Public Safety, Highway Patrol. Ochoa was stopped because he and the truck he was driving fitted a profile developed for the detection of stolen motor vehicles. Detective C. W. Stinchfield of the Pima County Sheriff's Office, who at that time was assigned to its auto theft detail, approached Ochoa and requested that he shut off the ignition while they talked. In order to do so, Ochoa had to lean forward and put one hand under the dash. Detective Stinchfield could see a second ignition switch hanging there.

In a late model Ford pickup, the ignition switch is so mounted on the dash that there is a four-prong plug at the back. This plug can be pulled out and another switch can be plugged in. Then with a key for the second switch, the engine can be started and stopped. Officer Stinchfield, after observing the second ignition switch under the dash, directed Ochoa to get out of the Ford truck, patted him down for weapons, and asked him to whom the truck belonged. Ochoa replied that he had stolen it in Tucson. Officer Stinchfield then placed Ochoa under arrest and read him his legal rights.

It was Ochoa's position in the court below that there was no probable cause to stop him or the vehicle he was driving and that consequently everything which followed the stop was contaminated by the wrongful action of the officers in the first instance. The State's position is that police officers may stop the driver of a motor vehicle on the public highways of Arizona to check the registration of the vehicle and his operator's license.

A.R.S. § 28–305D requires that the registration card of a motor vehicle be carried in plain sight in the driver's compartment of the vehicle for which it is issued and "shall be subject to inspection by the vehicle superintendent or his authorized agent,

members of the highway patrol or any peace officer." A.R.S. § 28-423 requires that every person having an operator's or chauffeur's license shall have it in his immediate possession when operating a motor vehicle and "shall display the same, upon demand of a justice of the peace, a police officer or a field deputy or inspector of the department." Some states' courts have held that statutes similar to these authorize police officers to stop motor vehicles at random to examine the vehicle's registration and the operator's license. *See, e. g., Morgan v. Town of Heidelberg,* 246 Miss. 481, 150 So.2d 512 (1963); *State v. Gray,* 59 N.J. 563, 285 A.2d 1 (1971).

We, however, are convinced that neither statute authorizes the stopping of travelers upon public highways for the purpose of ascertaining whether the driver is violating the law. In this we think there is a valid distinction between a stop made for the purpose of investigating a crime already known to have been committed and a stop for the purpose of discovering crime in the first instance.

The Fourth Amendment to the Constitution of the United States guarantees that the people will be secure in their persons against unreasonable searches and seizures. A person is "seized" within the meaning of the Fourth Amendment when he is accosted by a police officer who restrains his freedom to walk away.

"There is some suggestion in the use of such terms as 'stop' and 'frisk' that such police conduct is outside the purview of the Fourth Amendment because neither action rises to the level of a 'search' or 'seizure' within the meaning of the Constitution. We emphatically reject this notion. It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889, 903 (1968).

It is clear that when Ochoa was accosted by the police and stopped on Highway 89, his freedom was restrained and he was "seized" within the meaning of the Fourth Amendment to the  Constitution of the United States.

Both the Fourth Amendment to the Constitution of the United States and Article 2, § 8 of the Arizona Constitution, providing that "No person shall be disturbed in his private affairs * * * without authority of law." protect travelers upon the public highways from harassment by government agents if there is no basis to support a founded suspicion of criminal activity. Founded suspicion requires some reasonable ground for singling out a person as one who was involved or about to be involved in criminal activity. *United States v. Carrizoza-Gaxiola,* 523 F.2d 239 (9th Cir. 1975).

The Court of Appeals of this State, in *State v. Taras,* 19 Ariz.App. 7, 504 P.2d 548 (1972), in arriving at the same conclusion at which we have arrived, quoted with approval from *Wilson v. Porter,* 361 F.2d 412, 415 (9th Cir. 1966), language which we think is worth requoting:

"* * * due regard for the practical necessities of effective law enforcement requires that the validity of brief, informal detention be recognized whenever it appears from the totality of the circumstances that the detaining officers could have had reasonable grounds for their action. A founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing."

The Pennsylvania Supreme Court recently reached similar conclusions, holding:

"The crux of our decision that a stop of a single vehicle is unreasonable where there is no outward sign the vehicle or the operator are in violation of the Motor Vehicle Code, goes to the Common-

wealth's argument the police need no justification to stop the vehicle. * * *

The flaw in the Commonwealth's argument is it asks this Court to give the police absolute discretion and authority to intrude into the lives of people without any cause whatsoever. Under the Commonwealth's theory the police would need no justification to stop an automobile on the highway, and, hence, there could be no judicial review of the intrusion. There would be no buffer between the citizen and the officer 'engaged in the often competitive enterprise of ferreting out crime.' *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). Furthermore, if the police were given complete discretion to stop any automobile, this discretion could be used arbitrarily, or as a guise for seeking evidence of other crimes, or on mere 'fishing expeditions.'" *Commonwealth v. Swanger*, 453 Pa. 107, 307 A.2d 875, 878–79 (1973).

We think it is plain from a simple reading of the statutes, A.R.S. §§ 28–305D and 28–423, that neither contains language which expressly authorizes the stopping of a driver of a motor vehicle for the purpose of demanding proof from him that he is not violating the law. Nor do we infer from the legislative language an intent to permit the invasion of private rights by stopping people in order that they may be compelled to prove they are not committing public offenses.

The State, while recognizing that peace officers cannot constitutionally stop the drivers of motor vehicles at random on the chance of discovering something illegal, *see United States v. Mallides*, 473 F.2d 859 (9th Cir. 1973), urges a police task force developed a profile, by the use of which there was a founded suspicion that Ochoa was driving a stolen vehicle. The Supreme Court of the United States has laid down the test that:

"* * * in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry v. Ohio*, supra, 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.

This Court has previously held, in *State v. Becerra*, 111 Ariz. 538, 534 P.2d 743 (1975), that a stop by border patrol officers was lawful where the officers were attempting to prevent the illegal importation of aliens under the circumstances that (1) the back end of the vehicle appeared to be overloaded, (2) the apparent nationality of the driver was Mexican, (3) the particular place was close to the Mexican border and the time of day was early in the morning. We said:

"The combination of these circumstances establishes a profile sufficient to sustain the stop and search." 111 Ariz. at 541, 534 P.2d at 746.

The profile pursuant to which Ochoa and his vehicle were stopped was developed at a meeting of peace officers in Phoenix on May 15, 1974. This meeting was called specifically to discuss the problem of stolen vehicles being taken to Mexico where they were either sold or traded for narcotics. Approximately 40 representatives from various agencies were present. The participants consisted of members from the United States Attorney's Office, the County Attorney's Offices of Maricopa, Pima and Santa Cruz Counties, agents of the Federal Bureau of Investigation, and of the Phoenix, Tucson and Yuma Police Departments, and members of the National Auto Theft Bureau. At the meeting, a profile was developed from an analysis of the 6,000 thefts in Phoenix in 1973 and 4,000 thefts in the first five months of 1974. In the Phoenix area, Fords and Chevrolets constituted at least 75% of the stolen vehicles, 90% of which were not recovered. It was ascertained through pooled information that vehicles which were particularly in demand for sale in Mexico were 1972 through 1974 Ford and Chevrolet sedans and 1972 through 1974 Ford, Chevrolet, GMC and Dodge pickups,

although vehicles manufactured for the years 1970 to 1972 may have also been used in the profile.

In addition, these factors were found to be significant: The driver would probably be between 17 and 27 years of age; he would usually be alone; he would have no apparent luggage; if there was a passenger, there would be no children; and the car's license plate would show a registration to either Pima or Maricopa County. There was no testimony as to the number of vehicles and persons which fit this profile, but the evidence did indicate that this profile fit only a small percentage of those people driving between Tucson and Nogales.

After this meeting, a task force was organized consisting of members from both the Phoenix and Tucson Police Departments, members of the Arizona Department of Public Safety, the Pima County Sheriff's Office, the Federal Bureau of Investigation and of the National Auto Theft Bureau. Teams were put together to work the highway between Tucson and Nogales, Arizona. A two-man unit was used as spotters, whose job was to watch approaching traffic and alert by radio a unit called the "marked unit" which then halted suspicious vehicles and investigated them as possibly stolen. Whether there was a reasonable suspicion that the vehicle was stolen was to be determined from the driver's license and the vehicle registration.

This task force operation was carried on approximately 30 miles north of the border town of Nogales, Arizona. In the first 14 days of June before the task force went into operation, there were 26 profile vehicles stolen, of which only four were recovered, for a percentage of recovered vehicles of 15.38%. After June 14, while the task force was in operation, there were nine profile vehicles stolen and three recovered, for a percentage of 33⅓%. The team operated for a three-day period in July and recovered vehicles of the approximate value of $25,000. We do not consider it significant that the recoveries were for but a small percentage of the entire body of stolen vehicles. One person who was apprehended admitted to stealing over 100 trucks and cars and taking them to Mexico, and another person apprehended admitted to stealing approximately 150 vehicles. The justification for the use of the profile lies in the fact that apprehension of one such person might stop the future theft of many vehicles and thus significantly reduce criminal activities in this area.

■ We therefore hold that the stop here questioned is warranted by specific and articulable facts taken together with rational inferences therefrom and satisfies the test laid down in *Terry v. Ohio*, supra. Any statements in *State v. Ream*, 19 Ariz. App. 131, 505 P.2d 569 (1973), and *State ex rel. Berger v. Cantor*, 13 Ariz.App. 555, 479 P.2d 432 (1970), conflicting with those expressed herein are disapproved.

The judgment of the Superior Court is reversed.

CAMERON, C. J., and HOLOHAN and GORDON, JJ., concur.

HAYS, Justice (specially concurring).

Although I agree with the result reached in the majority opinion, I cannot support a position which holds that the Arizona licensing and registration statutes, ARS § 28–423 and § 28–302, do not authorize "the stopping of travelers upon public highways for the purpose of ascertaining whether the driver is violating the law."

According to the foregoing bald position, the only way that these statutes can be enforced is when a "founded suspicion" of some other violation of the laws results in a valid stop. The majority, in citing examples of cases supporting *our* position, referred to Mississippi and New Jersey opinions, states far removed from Arizona. In our own back yard, we have, among others, *People v. Washburn*, 265 Cal.App.2d 665, 71 Cal.Rptr. 577 (1968), and *Lipton v. United States*, 9 Cir., 348 F.2d 591 (1965). The California statute on drivers' licenses is remarkably close to that of Arizona, and

the Ninth Circuit Court of Appeals, in applying that statute in *Lipton v. United States, supra,* said " . . . The necessary implication of those code provisions is that a peace officer in the proper discharge of his duty has the right to stop a driver and make such demand." 348 F.2d at 593. The same court went on to say:

"If stopping appellant for the sole purpose of inquiring whether he held a license for the activity in which he was engaged was in any sense a 'seizure' it was not an 'unreasonable' one, and did not violate any right given appellant by the Fourth Amendment, made applicable to the State by the Fourteenth. Cf. *Rios v. United States,* 364 U.S. 253, 262, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960). A contrary holding would render unenforceable the State statute requiring that automobile drivers be licensed." 348 F. 2d at 593.

In a recent case cited in the majority opinion, *United States v. Carrizoza-Gaxiola,* 523 F.2d 239 (9th Cir. 1975), the court said:

"The government advances two arguments for the constitutionality of the stop. First, the government argues that our decision in *Lipton v. United States,* 348 F.2d 591 (9th Cir. 1965), permits stops without founded suspicion to check drivers' licenses and vehicle registrations. Assuming the vitality of that decision subsequent to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the rationale of *Lipton* is that laws requiring possession of drivers' licenses while driving could not otherwise be effectively enforced. *Id.* at 593. We have limited *Lipton* to that rationale; it permits stops without founded suspicion only to enforce laws susceptible of no other means of effective enforcement. *United States v. Bowen,* 500 F.2d 960, 964–65 (9th Cir.) (en banc); *see id.* at 972 n. 9, 973–74 (Wallace, J., dissenting), aff'd on separate issue, 422 U.S. 916, 95 S.Ct. 2569, 45 L.Ed.2d 641 (1975.)" 523 F.2d at 241.

In view of the fact that the stop here was to check for stolen vehicles rather than to check driver licensing or vehicle registration, there was no need to address this issue. To gratuitously meet the issue under this factual framework may well necessitate judicial gymnastics under another fact situation.

I concur in the result.