560 P.2d 62

The STATE of Arizona, Appellant,

v.

Tommy K. CURLIN, Appellee.

No. 2 CA–CR 807.

Court of Appeals of Arizona,
Division 2.

Nov. 30, 1976.

Rehearing Denied Jan. 12, 1977.

Review Denied Feb. 1, 1977.

Bruce E. Babbitt, Atty. Gen. by William J. Schafer, III, Asst. Atty. Gen., Phoenix, for appellant.

Stolkin, Weiss & Tandy by Stephen M. Weiss, Tucson, for appellee.

OPINION

KRUCKER, Judge.

The State appeals from a granting of a motion to suppress evidence. We believe the trial court's ruling was in error and we therefore reverse.

The applicable facts follow. In July, 1975, appellee was a Tucson police officer. He informed Major Dupnik of the Tucson Police Department that he had stolen a new car from the Paulin Motor Company in Tucson some time that month. He did not describe the car in any way. Major Dupnik informed a subordinate, Detective Polito, that there had been a theft by Officer Curlin and a general search for the car was started. The Motor Company was contacted, but they were not aware of any stolen car. A new car dealership across the street from Paulin Motor Company was also contacted with the same result. Through police investigation, associates of Curlin were contacted and on August 3 it was learned from Dale Warren, a friend of Curlin's, that a few weeks prior, Curlin showed up with a brand new Ford automobile, and it was not the car Curlin had taken to work that particular day. The two took a ride in the automobile and spent some time at a bar. Warren said that his friend told him he had received the new automobile as part of a settlement in a lawsuit for injuries he had sustained earlier.

A few days after this, Curlin called Warren and asked if Warren could pick him up at 22nd and Treat Streets in Tucson, telling

Warren that he had hidden the automobile because he was having marital trouble, expected a divorce, and didn't want his wife to receive the car in a divorce settlement. Warren picked Curlin up in the aforementioned area and took him home. At the end of July, Curlin told Warren that he thought he was under surveillance by the police because he had spotted Detective Spivey watching him. He advised Warren that if the police asked any questions about him (Curlin) or pertaining to any criminal activity, to refuse to respond until Warren had an opportunity to talk with Curlin's attorney.

Later, after hearing a rumor that the police suspected Curlin of being involved in an automobile theft ring, Warren became suspicious and concerned that he might be implicated in the thefts as he had ridden in the car. Therefore he decided to contact the police. After hearing Warren's story, the police, with Warren, went to the area of 22nd and Treat in an attempt to locate the automobile. They covered the area block by block, looking for a car with a cover because Curlin told Warren that he had bought a cover for it and put license plates on it from another vehicle owned by Curlin. The car was spotted in the 2800 block of East Stratford Drive. It was parked about 100 feet off the street toward the back of a yard next to a fence and off the driveway. A light was shone on the vehicle and the license number was copied. A check with the computer service by a nearby telephone revealed no such number among the list of recently stolen cars.

Warren was taken away from the scene and the two detectives approached the house at the East Stratford location. They identified themselves to two males who responded and who identified themselves as renters in the house who had no connection with the automobile. The detective learned from the two that a close friend of Curlin's, Vicky Espey, had called the reputed owner of the home on Curlin's behalf and asked if he could park the car at her home. The detectives told the male occupants of the home that they suspected the car was stolen

and asked who the owner was and if they could cross the property to look at the vehicle identification number. One of the men said he would rather not tell them who the owner was and he didn't think the owner would want them examining it. One of the occupants stated that the car belonged to a boyfriend of the sister of the woman who owned the house and during the conversation the name "Tommy" was used. One of the men made a phone call and informed the detectives that they were not to go on the property and were not to look at the car. A few seconds later the phone rang and after that conversation, the police were told that the owner was on the way over.

At about that time a uniformed police officer, Walsh, arrived. When informed as to what was occurring, he said that in addition to being a Tucson Police Officer he was a commissioned agent of the State Motor Vehicle Division and as such had the authority to inspect the vehicle. He went over to the car and visually examined it, looking for the vehicle identification number on the dashboard, but it was covered by a road map and the car was locked. Eventually a coat hangar was secured and Officer Walsh opened the door, uncovered the identification number and looked in the glove compartment for the registration papers. There was no registration, but there was a title application in the name of Tommy Curlin. The police then left, telling both Vicky Espey, who had arrived on the scene, and the occupants of the house that they had accomplished their purpose—to verify the ownership and registration of the car. Subsequent investigation revealed that the vehicle had been stolen from Holmes Tuttle Ford in Tucson on or about July 18, 1975. The license plate on the automobile had actually been issued to a 1968 Pontiac owned by Curlin and Curlin had recently reported the plates lost and was issued a second set.

The Ford automobile was seized and two sets of photographs of the 1968 Pontiac in the Curlin driveway were taken, one without a telephoto lens and the second with a telephoto lens. Curlin was charged with

alternative counts of grand theft and receiving/possessing a stolen automobile, both alleged offenses to have occurred on July 18, 1975, the day the automobile was stolen. Curlin moved to suppress all evidence flowing from the search and seizure of the Ford automobile, the identification number, title application, license plate numbers, even the vehicle itself. Five weeks later defense counsel filed an amendment to the motion to suppress asking that the court also suppress all photographs taken of Curlin's 1968 Pontiac. A hearing on the motion was held December 15 and the motion was granted on January 12, 1976. The granting of the motion made no distinction between the original motion and the amendment and therefore we must assume that all the evidence requested to be suppressed was indeed suppressed.[1]

We choose not to discuss the issue of whether appellee does or does not have standing to challenge the search of the automobile because even assuming arguendo that he does have standing, the search was still valid. All that was required was that the officers had probable cause to search. *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). We think that under the circumstances the officers were correct in opening the car to obtain the vehicle identification number. Through a friend of appellee's, the police learned that appellee was driving a brand-new Ford automobile claiming to have received it as a settlement in an accident dispute. The officers learned that he had hidden the car in a certain area which the friend identified, allegedly so that his wife couldn't claim the vehicle in a possible dissolution action. With the help of appellee's friend, the automobile was located parked near where the friend thought it would be. The fact that a check of the license plate did not disclose the vehicle as

stolen was no reason for the officers to drop the investigation. Such check did not vitiate their suspicions and the officers were certainly entitled to pursue their investigation. When they discovered that the identification number on the dashboard was covered by a roadmap, they were armed with a rational suspicion so as to entitle them to enter the vehicle to perform a limited search. *State v. Ochoa*, 112 Ariz. 582, 544 P.2d 1097 (1976). The suspicion was well-founded that the car was stolen and the search to be conducted was for a limited purpose—to determine if the car were indeed stolen. When the officers believed they had accomplished that purpose, they ceased. Appellee's argument that the officers, assuming they did have probable cause, should have obtained a search warrant before breaking into the automobile is without merit in light of the recent decision of *State of Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975).

We hold that the search of the vehicle was proper, based on probable cause, and the motion to suppress the evidence gathered from the search should have been denied.

Reversed.

HOWARD, C. J., and HATHAWAY, J., concur.

---

1. As a result of the testimony adduced at the hearing on the motion to suppress, it is evident that the photographs were not taken until after the search and seizure on August 4, 1976, and the seizure of the Ford vehicle on August 5. Therefore, the photographs are not relevant to the issue of probable cause to search and we do not have to deal with them. In any case, our analysis of the case will show that the photographs are not the fruit of the poisonous tree as appellee maintains.