STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. JOHN A. CARPENTIERI, DEFENDANT-RESPONDENT.

Argued February 5, 1980—Decided May 19, 1980.

*William F. Lamb*, Deputy Attorney General, argued the cause for appellant (*John J. Degnan*, Attorney General of New Jersey, attorney).

*Gary Kroop* argued the cause for respondent (*Stepacoff, Koch and Kroop*, attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

Defendant was convicted of possession of marijuana in violation of *N.J.S.A.* 24:21–20(a)(4) and possession with intent to distribute in violation of *N.J.S.A.* 24:21–19(a)(1). On appeal the Appellate Division viewed the issue as whether "the trial judge erred in denying defendant's motion to suppress evidence seized in a car driven by defendant after it was stopped for a routine 'license and registration check.'" *State v. Carpentieri*, 168 *N.J.Super.* 589, 591 (1979).

In reversing the conviction the court below gave retroactive application to *Delaware v. Prouse*, 440 *U.S.* 648, 99 *S.Ct.* 1391, 59 *L.Ed.*2d 660 (1979), in which the United States Supreme Court held "random traffic stops" invalid. *Prouse* was decided after Carpentieri's arrest, conviction, and notice of appeal, but before the Appellate Division resolution of his appeal. There is, of course, no question that *Prouse* effected a radical departure from the state of our law as it existed up until the date of that decision, for until then such random stops were expressly authorized under case law in New Jersey, see *State v. Gray*, 59 *N.J.* 563, 567 (1971); *State v. Braxton*, 57 *N.J.* 286, 287 (1970); *State v. Kabayama*, 98 *N.J.Super.* 85, 87–88 (App.Div.1967), aff'd o. b., 52 *N.J.* 507 (1968), and at least inferentially under our statutory law, see *N.J.S.A.* 39:3–29. In bringing the newly-declared *Prouse* doctrine to bear on the case at hand the Appellate Division held that "since this appeal was pending at the time of the *Prouse* decision, its principle of exclusion of seized material effected on a 'random stop' and search is applied here." 168 *N.J.Super.* at 593. Hence that court did not address defendant's remaining contention for reversal, that is, the absence of probable cause to search the vehicle's trunk.

■ We reverse. *Delaware v. Prouse, supra*, applies only to those cases wherein the "random traffic stop" occurs after the date of the *Prouse* decision, March 27, 1979. In *State v. Howery*, 80 *N.J.* 563 (1979), this Court held that retroactivity should

not be accorded the decision in *Franks v. Delaware*, 438 *U.S.* 154, 98 *S.Ct.* 2674, 57 *L.Ed.*2d 667 (1978).[1] *Franks*, like *Delaware v. Prouse*, an exclusionary rule case, stands for the proposition that under certain circumstances a defendant may challenge the veracity of an affidavit supporting a search warrant. *Howery* limits the *Franks* rule "to search warrants issued after the *Franks* decision \* \* \* ." 80 *N.J.* at 571. The same principle of retroactivity applies to the case before us.

## I

Neither the defendant nor the dissenting opinion challenges the controlling effect of *Howery*. What is put in issue is the soundness of that decision. Being satisfied that *Howery* was rightly decided, we affirm the principles stated therein. The reasoning supporting those principles bears repetition in truncated form.

In *Howery* we recognized that the retroactive application of a new rule of law is determined by examining " '(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice.' " 80 *N.J.* at 569 (quoting from *State v. Nash*, 64 *N.J.* 464, 471 (1974)). In the instant case the principles of deterrence underlying *Prouse* would hardly be fostered by retroactive application to law enforcement actions undertaken in good-faith reliance upon then long-standing legal authority. Approval of such an exercise would doubtless require judicial review relative to probable cause of the operative facts surrounding many automobile stops effected in this state prior to *Prouse*. The consequent encumbering of an already overburdened judiciary

---

[1]*Howery* had not yet been decided when the Appellate Division opinion in the instant case was handed down on June 11, 1979. See *State v. Mann*, 171 *N.J.Super.* 173, 180 (App.Div.1979).

would operate only to the detriment of the administration of justice.

Again the charge is made here, *post* at 566–567 (Pashman, J., dissenting), as it was in *Howery*, 80 *N.J.* at 578–79 (Pashman, J., dissenting) that the Court is blithely ignoring "the imperative of judicial integrity." We prefer to view "judicial integrity" as being perceived in its proper perspective rather than ignored. *Howery*'s anchor to *United States v. Peltier*, 422 *U.S.* 531, 537–38, 95 *S.Ct.* 2313, 2317–2318, 45 *L.Ed.2d* 374, 381 (1975), needs little more weight than that furnished by the Supreme Court's declaration that " '[i]t would seem to follow * * * from the *Linkletter* [*v. Walker*, 381 *U.S.* 618, (85 *S.Ct.* 1731), 14 *L.Ed.2d* 601 (1965)] and *Fuller* [*v. Alaska*, 393 *U.S.* 80, (89 *S.Ct.* 61), 21 *L.Ed.2d* 212 (1968)] holdings that the "imperative of judicial integrity" is *also* not offended if law enforcement officials reasonably believed in good faith that their *conduct* was in accordance with the law * * * .' " 80 *N.J.* at 571 (quoting from *United States v. Peltier*, 422 *U.S.* at 537–38, 95 *S.Ct.* at 2317–2318, 45 *L.Ed.2d* at 381 (emphasis supplied and in original)). See also *Stone v. Powell*, 428 *U.S.* 465, 486, 96 *S.Ct.* 3037, 3048, 49 *L.Ed.2d* 1067, 1083 (1976). We add only that integrity of the judicial process involves the *entire* judicial process, including ultimately how successful and fair has been its search for and ascertainment of the truth.

The dissent makes the sweeping contention that "[t]he retroactivity of a judicial decision is at issue only where it constitutes a 'sharp break' with the line of earlier authority. If it does not, then retroactive application follows." *Post* at 557 (Pashman, J., dissenting). While the "sharp break" test may have had considerable support prior to 1975, when *United States v. Peltier, supra*, was decided, it was quite plainly abandoned altogether by the *Peltier* Court as the standard for determining the retroactive applicability of the exclusionary rule in cases involving searches invalid under the fourth amendment. Note, "*A La*

*Recherche Du Temps Perdu:* Retroactivity and the Exclusionary Rule," 54 *N.Y.U.L.Rev.* 84, 85–87, 97–98 (1979).

Therefore, it is of no moment whether the *Prouse* decision in fact represents a "sharp break" with existing law or is nothing more than a logical development following almost inevitably from earlier exclusionary rule decisions. What is important is that the Supreme Court's position today on retroactivity in the context of the exclusionary rule is unmistakable. Justice Rehnquist outlined the development of that position in *Peltier, supra,* as follows: [2]

> Since 1965 this Court has repeatedly struggled with the question of whether rulings in criminal cases should be given retroactive effect. In those cases "[w]here the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials," *Williams v. United States,* 401 *U.S.* 646, 653, 91 *S.Ct.* 1148, [1152], 28 *L.Ed.2d* 388 (1971) the doctrine has quite often been applied retroactively. It is indisputable, however, that in every case in which the Court has addressed the retroactivity problem in the context of the exclusionary rule, whereby concededly relevant evidence is excluded in order to enforce a constitutional guarantee that does not relate to the integrity of the factfinding process, the Court has concluded that any such new constitutional principle would be accorded only prospective application. [422 *U.S.* at 535–36, 95 *S.Ct.* at 2316, 45 *L.Ed.2d* at 379–80.]

---

[2]See, *e. g., Desist v. United States,* 394 *U.S.* 244, 89 *S.Ct.* 1030, 22 *L.Ed.2d* 248 (1969), holding that the invalidation of certain wiretapping procedures effected by *Katz v. United States,* 389 *U.S.* 347, 88 *S.Ct.* 507, 19 *L.Ed.2d* 576 (1967), was not to be applied retroactively; *Fuller v. Alaska,* 393 *U.S.* 80, 89 *S.Ct.* 61, 21 *L.Ed.2d* 212 (1968), holding that the ban to the admission of evidence seized in violation of the Federal Communications Act as construed in *Lee v. Florida,* 392 *U.S.* 378, 88 *S.Ct.* 2096, 20 *L.Ed.2d* 1166 (1968), was to have exclusively prospective effect; *Williams v. United States,* 401 *U.S.* 646, 91 *S.Ct.* 1148, 28 *L.Ed.2d* 388 (1971), holding nonretroactive the *Chimel v. California,* 395 *U.S.* 752, 89 *S.Ct.* 2034, 23 *L.Ed.2d* 685 (1969), decision narrowing the scope of the area subject to warrantless search incident to arrest.

## II

In the face of this definitive statement defendant argues that the Supreme Court's one sentence order in *Kretchmar v. Nebraska*, 440 *U.S.* 978, 99 *S.Ct.* 1783, 60 *L.Ed.*2d 237 (1979), represents a clear contrary declaration on retroactivity in this area. This contention requires that we examine the case in detail.

*Kretchmar* was observed travelling on an interstate highway by a Nebraska State Police officer who perceived an incongruity between Kretchmar's outward appearance and the late model automobile he was driving. The officer further suspected, on the basis of Kretchmar's appearance, that he might be an illegal alien. Accordingly, the officer directed the Kretchmar automobile to the side of the highway for investigation. Events transpiring thereafter eventually led to the discovery of approximately 466 pounds of marijuana in the vehicle.

The drug offense convictions emanating from the marijuana discovery were subsequently upheld by the Nebraska Supreme Court by a four to three vote. *State v. Kretchmar*, 201 *Neb.* 308, 267 *N.W.*2d 740 (Sup.Ct.1978). The majority found authorization for the initial stop of the automobile in a Nebraska statute which empowered officers in uniform to require any motorist to stop and exhibit his driving and vehicle credentials. Iterating an observation from one of its previous decisions the Court declared that " '[a] routine license check and its concomitant temporary delay of a driver does not constitute an arrest in a legal sense where there is nothing arbitrary or harassing present.' " *Id.* at 310, 267 *N.W.*2d at 742 (quoting from *State v. Holmberg*, 194 *Neb.* 337, 231 *N.W.*2d 672 (Sup.Ct.1975)). The Court further concluded:

The stopping of Kretchmar for the purpose of checking his driver's license and the certificate of registration for the car he was driving, if it may be construed to be a seizure, was not in any sense an unreasonable one. It did not violate any right given Kretchmar by the Fourth Amendment to the Federal Constitution.

[*State v. Kretchmar, supra,* 201 *Neb.* at 311, 267 *N.W.*2d at 743 (citations omitted).]

Finding no legal infirmity in the police action which led to the uncovering of the marijuana, the Court affirmed Kretchmar's convictions. 201 *Neb.* at 311–317, 267 *N.W.*2d at 743–45.

Kretchmar's subsequent petition for *certiorari* to the United States Supreme Court echoed the views of the dissenting members of the Nebraska Supreme Court. Focusing primarily upon the legality of the stop of the vehicle the Kretchmar petition questioned, among other things, whether the " * * * Fourth Amendment prohibit[s] isolated stops of moving vehicles absent probable cause or articulable grounds to believe that crime was committed or traffic laws violated." See *Kretchmar v. Nebraska,* 440 *U.S.* 978, 99 *S.Ct.* 1783, 60 *L.Ed.*2d 237 in Summaries of Docket Cases, 24 *Crim.Law Rptr.* 4071–72 (Nov. 1, 1978).

Thereafter, as noted above, on March 27, 1979, the *Prouse* decision was handed down, holding random stops for credentials checks constitutionally invalid. Approximately one week later the Supreme Court issued the following order in *Kretchmar* :

On petition for writ of certiorari to the Supreme Court of Nebraska. Petition for writ of certiorari granted, judgment vacated and case remanded to the Supreme Court of Nebraska for further consideration in light of *Delaware v. Prouse,* 440 *U.S.* 648, 99 *S.Ct.* 1391, 59 *L.Ed.*2d 660 (1979). [*Kretchmar v. Nebraska,* 440 *U.S.* 978, 99 *S.Ct.* 1783, 60 *L.Ed.*2d 237 (1979).]

On remand, the Nebraska Supreme Court evidently concluded that its reconsideration of the case was limited to direct application of the new principles announced in *Prouse* and, on that basis, summarily reversed Kretchmar's convictions and ordered the dismissal of all the charges preferred against him. *State v. Kretchmar,* 203 *Neb.* 663, 280 *N.W.*2d 46 (Sup.Ct.1979) (*Kretchmar* II).

At the outset we observe that the summary holding of *Kretchmar* II is entirely unenlightening on the question of whether the retroactive application of *Prouse* to events transpiring long before the date of that determination was ever raised. Certainly it was not discussed or even adverted to in the decision. It would appear that there was not even any argument on the remand, inasmuch as the opinion contains no indication of appearance of counsel.

In any event, assuming the Nebraska Supreme Court felt that the mere fact the matter was remanded to it for reconsideration in light of *Prouse* mandated retroactive application of the *Prouse* rule, we must disagree with the course taken by that court. As we understand it, the Supreme Court was simply calling upon the Nebraska Supreme Court itself to resolve the issue of *Prouse*'s retroactivity, that question obviously not having been encompassed by Kretchmar's petition. The remand was thus entirely appropriate. See *United States v. Calandrella*, 605 *F.*2d 236, 250–53 (6 Cir. 1979), *cert.* den., 444 *U.S.* 991, 100 *S.Ct.* 522, 62 *L.Ed.*2d 420 (1980); C. Wright, *Law of Federal Courts* § 108 (3rd ed. 1976).

Lest there be any doubt on this score, *Bowen v. United States*, 422 *U.S.* 916, 95 *S.Ct.* 2569, 45 *L.Ed.*2d 641 (1975), should render the issue clear. In *Bowen*, the defendant was stopped by border patrol authorities who discovered contraband in Bowen's vehicle. This led to defendant's conviction on certain drug-related offenses in federal court. Following the affirmance of his convictions by the Ninth Circuit Court of Appeals, defendant petitioned for *certiorari* to the United States Supreme Court. That petition was still pending when the United States Supreme Court announced its decision in *Almeida-Sanchez v. United States*, 413 *U.S.* 266, 93 *S.Ct.* 2535, 37 *L.Ed.*2d 596 (1973), which invalidated the use of roving patrols to search motor vehicles with neither a warrant nor probable cause, at points removed

from the border and its functional equivalents. Shortly thereafter, the Court granted Bowen's petition, vacated the judgment below and remanded the matter to the Court of Appeals for further consideration in light of *Almeida-Sanchez v. United States*—precisely the procedure it subsequently utilized in the *Kretchmar* case. See *Bowen v. United States*, 413 *U.S.* 915, 93 *S.Ct.* 3069, 37 *L.Ed.2d* 1038 (1973).

Unlike the Nebraska Supreme Court, however, the Court of Appeals did not mechanically apply the rule of *Almeida-Sanchez*. Rather, it considered whether the new rule of law promulgated in that case was properly to be applied to events occurring before its announcement. Concluding that the mandate of *Almeida-Sanchez* would not be applied to invalidate border patrol searches conducted prior to the date of that decision, the Court of Appeals reaffirmed Bowen's convictions. See *United States v. Bowen*, 500 *F.2d* 960 (9 Cir. 1974).

Upon the grant of Bowen's subsequent petition for *certiorari* the United States Supreme Court determined that the Court of Appeals' determination of the retroactivity question had been correct and that the roving border patrol search prohibition of *Almeida-Sanchez* was not to be applied to cases, such as that of petitioner Bowen, involving border patrol searches conducted prior to the rendering of the *Almeida-Sanchez* decision. See *Bowen v. United States, supra*, 422 *U.S.* at 917–19, 95 *S.Ct.* at 2571–2572, 45 *L.Ed.2d* at 645–47.

■ Hence, *Bowen* demonstrates that summary orders by the Supreme Court directing remand for reconsideration in light of new exclusionary rule decisions do not intimate the Court's view on the retroactivity of such new decisions. It would appear simply that the Nebraska Supreme Court may have a different view of the state of the law in this regard. For the reasons we have sought to explicate, we do not accept its view despite our profound respect for that tribunal.

## III

The judgment is reversed. The cause is remanded to the Appellate Division for consideration of defendant's additional argument for reversal of the trial court's judgment of conviction.

Reversed and remanded.

PASHMAN, J., dissenting.

I respectfully dissent. The majority has made two fundamental errors in summarily rejecting defendant's contention that his prosecution was founded upon the unconstitutional seizure of his automobile. The majority assumes without discussion that the recent decision of the United States Supreme Court in *Delaware v. Prouse*, 440 *U.S.* 648, 99 *S.Ct.* 1391, 59 *L.Ed.*2d 660 (1979), represents such a change in federal constitutional law as to require prospective effect only. This assumption is mistaken, for *Prouse* is nothing but an application of settled Fourth Amendment doctrine which was first stated in *Terry v. Ohio*, 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968). Secondly, the majority fails again to give proper consideration to the "imperative of judicial integrity" which mandates that even major changes in the character of fundamental rights be applied with consistency to cases pending on direct appellate review. See *State v. Howery*, 80 *N.J.* 563, 575 (1979) (Pashman, J., dissenting). The majority opinion reflects no awareness that its approach to constitutional decision making allows similarly situated defendants to be treated differently.

## I

The majority considers *Delaware v. Prouse, supra,* in a jurisprudential vacuum and reaches the conclusion that it is a new decision. But it is not new law, and for that reason does not present an occasion for prospective overruling.

The retroactivity of a judicial decision is at issue only where it constitutes a "sharp break" with the line of earlier authority. If it does not, then retroactive application follows. This threshold test has been variously articulated in both civil and criminal settings.[1] In *Chevron Oil Co. v. Huson,* 404 *U.S.* 97, 106, 92 *S.Ct.* 349, 355, 30 *L.Ed.*2d 296 (1971), the Supreme Court stated that "the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, ˙ * * * or by deciding an issue of first impression whose resolution was not clearly foreshadowed * * *." (Citations omitted). The Court in *Desist v. United States,* 394 *U.S.* 244, 248, 89 *S.Ct.* 1030, 1032, 22 *L.Ed.* 2d 248 (1969), simply required that there be "a clear break with

---

[1]Another threshold test considers whether the integrity of the factfinding process is at stake. "Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect." *Williams v. United States,* 401 *U.S.* 646, 653, 91 *S.Ct.* 1148, 1152, 28 *L.Ed.*2d 388 (1971). See, *e. g., Arsenault v. Massachusetts,* 393 *U.S.* 5, 89 *S.Ct.* 35, 21, *L.Ed.*2d 5 (1968) (retroactive effect given to the right to counsel); *Roberts v. Russell,* 392 *U.S.* 293, 88 *S.Ct.* 1921, 20 *L.Ed.*2d 1100 (1968) (retroactive effect given to the rule in *Bruton v. United States,* 391 *U.S.* 123, 88 *S.Ct.* 1620, 20 *L.Ed.*2d 476 (1968), which held that admission of co-defendant's extrajudicial confession implicating defendant at a joint trial violated defendant's right of confrontation); *Reck v. Pate,* 367 *U.S.* 433, 81 *S.Ct.* 1541, 6 *L.Ed.*2d 948 (1961) (current standards of voluntariness applied retroactively to invalidate appellant's 1936 confession). The United States Supreme Court has also given complete retrospective effect to its recent interpretations of the Double Jeopardy Clause. *Robinson v. Neil,* 409 *U.S.* 505, 93 *S.Ct.* 876, 35 *L.Ed.*2d 29 (1973).

the past." In *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 *U.S.* 481, 499, 88 *S.Ct.* 2224, 2234, 20 *L.Ed.2d* 1231 (1968), the Supreme Court stated that the question of the prospective application of a decision could not even arise unless there was either "a sharp break in the line of earlier authority or an avulsive change which caused the current of the law thereafter to flow between new banks." See, *e. g., United States v. Bowen*, 500 *F.2d* 960, 975 n. 1 (9th Cir. 1974), aff'd, 422 *U.S.* 916, 95 *S.Ct.* 2569, 45 *L.Ed.2d* 641 (1975); *Gosa v. Mayden*, 413 *U.S.* 665, 672–673, 93 *S.Ct.* 2926, 2932–2933, 37 *L.Ed.2d* 873 (1973); *Michigan v. Payne*, 412 *U.S.* 47, 51, 93 *S.Ct.* 1966, 1968, 36 *L.Ed.2d* 736 (1973).

The "sharp break" standard has its origins in *Linkletter v. Walker*, 381 *U.S.* 618, 85 *S.Ct.* 1731, 14 *L.Ed.2d* 601 (1965), which held that the exclusionary rule of *Mapp v. Ohio*, 367 *U.S.* 643, 81 *S.Ct.* 1684, 6 *L.Ed.2d* 1081 (1961), would not be applied retroactively to vacate state convictions which had become final before the *Mapp* decision.[2] *Linkletter* held that the Federal Constitution neither prohibits nor requires retroactivity for "new" rules according criminal defendants greater constitutional protections. 381 *U.S.* at 629, 85 *S.Ct.* at 1737, 14 *L.Ed.2d* at 608. The Court's use of the "sharp break" test, and its presumption of retroactivity in the absence of a "sharp break" with the past, was founded on one of the classic notions of common-law adjudication: "the duty of the court was not to 'pronounce a new law, but to maintain and expound the old one.'" *Id.* at 622 -623, 85 *S.Ct.* at 1734 (quoting 1 Blackstone, *Commentaries* 69 (15th ed. 1809)). While the Court has firmly rejected the legal fiction that "all new interpretations of the Constitution must be considered always to have been the law and that prior constructions to the

---

[2]Prior to *Linkletter*, the Court had generally held that new constitutional rulings be given total retroactive effect. See generally *Robinson v. Neil*, 409 *U.S.* at 507, 93 *S.Ct.* at 877, 35 *L.Ed.2d* at 32; *Linkletter v. Walker*, 381 *U.S.* at 628 n. 13, 629, 85 *S.Ct.* at 1737 n. 13, 14 *L.Ed.2d* at 608 n. 13.

contrary must always be ignored," *Williams v. United States,* 401 *U.S.* at 651, 91 *S.Ct.* at 1151, 28 *L.Ed.2d* at 394 (citing *Linkletter v. Walker*), the Court has maintained that absent an overturning of the "prevailing statutory or constitutional norm," *United States v. Peltier,* 422 *U.S.* 531, 542, 95 *S.Ct.* 2313, 2320, 45 *L.Ed.2d* 374 (1975), a decision still carries a presumption of retroactivity. See *Williams v. United States, supra.*[3]

Although the majority contends that the "sharp break" test was "quite plainly abandoned altogether" by the Supreme Court in *United States v. Peltier, ante* at 550, I can find no such evidence of its abandonment. The majority in *Peltier* made no mention of the "sharp break" analysis in its opinion. The Court's discussion was confined to the retroactive application of "new constitutional doctrine" or a "new constitutional principle," 422 *U.S.* 535, 95 *S.Ct.* 2316, 45 *L.Ed.2d* 379, and was thus consistent with the "sharp break" analysis. It is difficult to believe that the Court would by mere silence overrule such a firmly-established doctrine. Moreover, in *Peltier* the Court declined to retroactively apply its decision in *Almeida-Sanchez v. United States,* 413 *U.S.* 266, 93 *S.Ct.* 2535, 37 *L.Ed.2d* 596 (1973),

---

3  A new variation on the traditional conception favoring retrospective application has been advanced by Professor Paul Mishkin:

> Actually, while the Blackstonian conception is not entirely valid, neither is it wholly wrong. For it is certainly true that courts in general handle the vast bulk of cases by application of preexisting law; indeed, even when "new law" must be made, it is often in fact a matter of the court articulating particular clear implications of values so generally shared in the society that the process might well be characterized as declaring a preexisting law. Moreover, this must inevitably be so. For it is the basic role of courts to decide disputes after they have arisen. That function requires that judicial decisions operate (at least ordinarily) with retroactive effect. In turn, unless those decisions (at least ordinarily) reflect preexisting rules or values, such retroactivity would be intolerable. [Mishkin, "The Supreme Court 1964 Term—Foreword: The High Court, The Great Writ, and Due Process of Time and Law," 79 *Harv.L.Rev.* 56, 60 (1965) (footnotes omitted)]

in which the Court held warrantless border searches without probable cause unconstitutional. Because *Almeida-Sanchez* "significantly expanded the scope of Fourth Amendment protection," *United States v. Dien,* 609 *F.*2d 1038, 1046 (2d Cir. 1979), the threshold "sharp break" test was implicitly satisfied in *Peltier.*

Even after the Supreme Court's decision in *Peltier,* courts have continued to apply variations of the "sharp break" analysis when retroactivity questions have arisen in Fourth Amendment cases. See, e. g., *United States v. Tucker,* 610 *F.*2d 1007, 1010–1013 (2d Cir. 1979) (applying *Dunaway v. New York,* 442 *U.S.* 200, 99 *S.Ct.* 2248, 60 *L.Ed.*2d 824 (1979), retroactively because it established no "new principle of law" (quoting *Chevron Oil Co. v. Huson,* 404 *U.S.* at 106, 92 *S.Ct.* at 355, 30 *L.Ed.*2d at 305)); *United States v. Dien,* 609 *F.*2d at 1046 (applying *Arkansas v. Sanders,* 442 *U.S.* 753, 99 *S.Ct.* 2586, 61 *L.Ed.*2d 235 (1979), retroactively because "unlike *Peltier* * * * we are not applying a decision of the court that significantly expanded the scope of Fourth Amendment protection. Rather, *Sanders,* merely gave further clarity to a doctrine that was in force at least since [*United States v.*] *Chadwick* [433 *U.S.* 1, 97 *S.Ct.* 2476, 53 *L.Ed.*2d 538]"; *United States v. Schleis,* 582 *F.*2d 1166, 1174 (8th Cir. 1978)(*en banc*) (applying *United States v. Chadwick* retroactively because "*Chadwick* announces no new constitutional doctrine, nor does it broaden any existing exclusionary rule" ); *United States v. Martinez,* 526 *F.*2d 954, 955 - 956 (5th Cir. 1976) (applying *United States v. Ortiz,* 422 *U.S.* 891, 95 *S.Ct.* 2585, 45 *L.Ed.*2d 623 (1975), and *United States v. Brignoni-Ponce,* 422 *U.S.* 873, 95 *S.Ct.* 2574, 45 *L.Ed.*2d 607 (1975), retroactively because they neither established a new rule in an overruling decision nor a new constitutional principle).

Applying this threshold analysis to the case before us, it can be seen that *Delaware v. Prouse, supra,* did not state a new constitutional doctrine in "sharp break" with the past. Prior to the random stop at issue—which occurred on November 13,

1976—the Supreme Court had already decided *United States v. Brignoni-Ponce, supra.* That case held that the practice by roving border patrol agents of stopping without cause any vehicle near the international border violated the Fourth Amendment. The Court's reasoning in *Brignoni-Ponce* began with the following general statement of the law of search and seizure:

> The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest. *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Terry v. Ohio*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, [1877], 20 L.Ed.2d 889 (1968). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person," *Terry v. Ohio*, supra, at 16, 88 S.Ct. 1868, 20 L.Ed.2d 889, and the Fourth Amendment requires that the seizure be "reasonable." As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. *Terry v. Ohio*, supra, at 20–21, 88 S.Ct. 1868, 20 L.Ed.2d 889; *Camara v. Municipal Court*, 387 U.S. 523, 536–537, 87 S.Ct. 1727 [1734], 18 L.Ed.2d 930 (1967). [422 *U.S.* at 878, 95 *S.Ct.* at 2578–2579, 45 *L.Ed.2d* at 614.]

Based on these general principles, the Court found a requirement of "reasonable suspicion" falling short of probable cause protected both the interests of the public in law enforcement and of border residents in personal privacy. See *id.* at 883, 95 *S.Ct.* at 2581, 45 *L.Ed.2d* at 617.

Although the decision in *Brignoni-Ponce* expressly reserved consideration of the limits of official discretion in making spot checks of licenses and registrations, see *id.* at 883 n. 8, 95 *S.Ct.* at 2581 n. 8, 45 *L.Ed.2d* at 618; see also *United States v. Martinez-Fuerte*, 428 *U.S.* 543, 560 n. 14, 96 *S.Ct.* 3074, 3084 n. 14, 49 *L.Ed.* 2d 1116 (1976), the Court's decision in *Prouse* was clearly not a "sharp break" with prior law. The case established no new doctrines, but rather merely applied settled principles of constitutional liberties, first enunciated in *Terry v. Ohio*, to investigate stops by state and local police. See 440 *U.S.* at 653 · 655, 99

S.Ct. at 1395–1397, 59 L.Ed.2d at 667–668. The Court found Brignoni-Ponce to be directly applicable:

> We cannot agree that stopping or detaining a vehicle on an ordinary city street is less intrusive than a roving-patrol stop on a major highway and that it bears greater resemblance to a permissible stop and secondary detention at a checkpoint near the border. In this regard, we note that Brignoni-Ponce was not limited to roving-patrol stops on limited-access roads, but applied to any roving-patrol stop by Border Patrol agents on any type of roadway on less than reasonable suspicion.  *  *  *  We cannot assume that the physical and psychological intrusion visited upon the occupants of a vehicle by a random stop to check documents is of any less moment than that occasioned by a stop by border agents on roving patrol. Both of these stops generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority. Both interfere with freedom of movement, are inconvenient, and consume time. Both may create substantial anxiety. [Delaware v. Prouse, 440 U.S. at 657, 99 S.Ct. at 1398, 59 L.Ed.2d at 659 (citations omitted)]

Since Prouse was simply an application of familiar principles of search and seizure law, it does not "constitute a sharp break in the line of earlier authority or an avulsive change" in the law. Hanover Shoe, Inc. v. United Mach. Corp., 392 U.S. at 499, 88 S.Ct. at 2234, 20 L.Ed.2d at 1244. Whatever support that might have been derived from earlier cases of this Court concerning random seizures, see State v. Gray, 59 N.J. 563, 567 (1971); State v. Kabayama, 98 N.J.Super. 85, 87–88, 236 A.2d 164 (App.Div.1967), aff'd o. b., 52 N.J. 507 (1968), was undercut by the clearly expressed principles governing investigative detentions in Brignoni-Ponce.[4] That case, decided after the cases of

---

[4]The majority also relies on N.J.S.A. 39:3–29 as additional authority for its view of prior law regarding investigatory stops of motor vehicles. Of course, federal constitutional decisions raise doubts concerning State statutes as well as caselaw. But it is even more telling to note that the statute says nothing about when a peace officer may request a driver's license. All it does state is that a motorist must present a license and other papers when the officer demands them. It does not provide when the officer may make a legitimate demand. That the statute was cited in State v. Gray, 59 N.J. at 567, does not alter the validity of this observation.

this Court which purportedly upheld random stops,[5] strongly intimated that such a practice was constitutionally impermissible. *Prouse* therefore stands as an application of settled principles which does not raise the retroactivity issues accompanying a "sharp break" with prior doctrine.

Virtually all courts which have considered *Prouse* in deciding a case which was pending direct appellate review on the date of the Supreme Court's decision [6] have not hesitated to apply it, without mentioning the issue of retroactivity. *Casal v. State*, 375 *So.*2d 1077 (Fla.Dist.Ct.App.1979); *Kennan v. State*, 372 *So.* 2d 1012 (Fla.Dist.Ct.App.1979); *State v. Tucker*, 286 *Or.* 485, 595

---

[5]The majority's assertion that *Prouse* effected a "radical departure" from "long-standing legal authority" appears to rest on *dicta* in *Gray* and *Kabayama*. While the Appellate Division's opinion in *Kabayama* mentioned the practice of randomly stopping single vehicles, 98 *N.J.Super.* at 88, the only issue before the court was whether "the practice of establishing roadblocks by the police for license and * * * registration checks" constitutes an unconstitutional invasion of privacy. *Id.* at 87. That *Prouse* would not disturb the result reached in *Kabayama* is clear from the Supreme Court's express statement that roadblock-type stops involving less than unbridled police discretion are not unreasonable under the Fourth Amendment. See 440 *U.S.* at 663, 99 *S.Ct.* at 1401, 59 *L.Ed.*2d at 673; *id.* at 663–664, 99 *S.Ct.* at 1401, 59 *L.Ed.*2d at 673–674 (Blackmun and Powell, JJ., concurring). Nor is it clear that an application of *Prouse* would invalidate the initial vehicle stop in *Gray.* The issue in *Gray* was whether the police had probable cause to search a manila envelope and the trunk of the vehicle after the driver failed to produce a license or registration card and engaged in other furtive behavior. 59 *N.J.* at 568. In commenting on the circumstances which preceded the initial stop, Justice Proctor cited *Kabayama*, but rested the validity of the seizure on the clear "aura of suspicion surrounding [Gray's] actions and his use of the automobile on the day in question." *Id.* at 567. This is consistent with *Prouse* which requires only that the vehicle stop be based on articulable and reasonable suspicion that the vehicle or an occupant is subject to seizure for violation of law. 440 *U.S.* at 663, 99 *S.Ct.* at 1401, 59 *L.Ed.*2d at 673.

[6]*Prouse* was decided on March 27, 1979.

P.2d 1364 (Sup.Ct.1979); *Hughes v. State*, 588 *S.W.*2d 296 (Tenn. Sup.Ct.1979). A recent decision by the United States Supreme Court indicates, at the least, no objection to such retroactive application.[7]

[7]In *State v. Kretchmar*, 201 *Neb.* 308, 267 *N.W.*2d 740 (Sup.Ct.1978), the Nebraska Supreme Court upheld a conviction for possession of marijuana discovered during a random stop. Subsequent to the date of the decision in *Prouse*, the Court granted certiorari, vacated the judgment of the Nebraska Supreme Court and remanded the case for further consideration in light of *Prouse*. 440 *U.S.* 978, 99 *S.Ct.* 1783, 60 *L.Ed.*2d 237 (1979). The Nebraska Supreme Court withdrew its former opinion, found *Prouse* to be applicable— again, without mention of retroactivity—and remanded to the trial court with instructions to dismiss. 203 *Neb.* 663, 280 *N.W.*2d 46 (Sup.Ct.1979). Although one can only speculate as to the meaning of the United States Supreme Court's actions in *Kretchmar*, I believe, as did the Nebraska Supreme Court, that those actions signal the fact that *Prouse* need not be limited to prospective effect only.

*Kretchmar* is highly analogous to prior actions by the Supreme Court involving *United States v. Chadwick*, 433 *U.S.* 1, 97 *S.Ct.* 2476, 53 *L.Ed.*2d 538 (1977), where the Court held that a search warrant is required before police may open a locked footlocker which they lawfully seized at the time of the arrest of its owner, when there was probable cause to believe it contained contraband. In June 1977 the Supreme Court vacated a judgment of the Court of Appeals for the Eighth Circuit, involving a 1974 briefcase search, 543 *F.*2d 59 (8th Cir. 1976), and remanded for further consideration in light of *Chadwick*. *Schleis v. United States*, 433 *U.S.* 905, 97 *S.Ct.* 2968, 53 *L.Ed.*2d 1089 (1977). On remand *en banc*, the Eighth Circuit held that *Chadwick* was to be accorded retrospective effect because "*Chadwick* announces no new constitutional doctrine, nor does it broaden any existing exclusionary rule." *United States v. Schleis*, 582 *F.*2d 1166, 1174 (8th Cir. 1978) (*en banc*). The court specifically noted that if the Supreme Court had not intended *Chadwick* to be applied retroactively, there would have been no reason for a remand. *Id.* at 1173 n. 6; see also *People v. Minjares*, 24 *Cal.*3d 410, 153 *Cal.Rptr.* 224, 228–230, 591 *P.*2d 514, 519–520 n. 6 (Sup.Ct.1979), *cert.* den., 444 *U.S.* 887, 100 *S.Ct.* 181, 62 *L.Ed.*2d 117 (1979).

## II

### A

Even apart from the "sharp break" test, the *Prouse* holding should be applied to cases such as this one which were pending direct review when *Prouse* was decided. As stated above, the Constitution neither prohibits nor requires such retrospective effect. See *Linkletter,* 381 *U.S.* at 629, 85 *S.Ct.* at 1737, 14 *L.Ed.*2d at 608. In the words of Justice Cardozo: "We think the federal constitution has no voice upon the subject." *Great Northern R. Co. v. Sunburst Oil & Refining Co.,* 287 *U.S.* 358, 364, 53 *S.Ct.* 145, 148, 77 *L.Ed.* 360 (1932). Without such guidance, "in each case a court must weigh and balance the competing considerations militating in favor of or against any particular form of retroactivity." *State v. Howery,* 80 *N.J.* at 577 (Pashman, J., dissenting). This Court has identified the following criteria as relevant to such a determination:

(1) the purpose of the rule and whether it would be furthered by a retroactive application,

(2) the degree of reliance placed on the old rule by those who administered it, and

(3) the effect a retroactive application would have on the administration of justice. [*State v. Howery,* 80 *N.J.* at 569 (quoting *State v. Nash,* 64 *N.J.* 464, 471 (1974))]

See, *e. g., Williams,* 401 *U.S.* at 652, 91 *S.Ct.* at 1152, 28 *L.Ed.*2d at 394; *Johnson v. New Jersey,* 384 *U.S.* 719, 728, 86 *S.Ct.* 1772, 1778, 16 *L.Ed.*2d 882 (1966); *Stovall v. Denno,* 388 *U.S.* 293, 297, 87 *S.Ct.* 1967, 1970, 18 *L.Ed.*2d 1199 (1967); *Linkletter,* 381 *U.S.* at 636, 85 *S.Ct.* at 1741, 14 *L.Ed.*2d at 612. For many of the same reasons that I expressed in *Howery,* 80 *N.J.* at 575 (Pashman, J., dissenting), I am of the opinion that each of the above factors militates in favor of applying *Prouse* to this and all other cases in which avenues of direct review were not exhausted prior to the date of that decision.

By reaffirming the *Howery* position on retroactivity as it relates to the Fourth Amendment, the Court again ignores the fact that deterrence is not the sole purpose of the exclusionary rule. It is also designed to uphold "the imperative of judicial integrity." *Mapp v. Ohio,* 367 *U.S.* at 659, 81 *S.Ct.* at 1694, 6 *L.Ed.*2d at 1092; *Elkins v. United States,* 364 *U.S.* 206, 221 -222, 80 *S.Ct.* 1437, 1446–1447, 4 *L.Ed.*2d 1669 (1960). This rationale lies at the heart of the exclusionary rule because "[a] ruling admitting evidence in a criminal trial * * * has the necessary effect of legitimizing the conduct which produced the evidence, while an application of the exclusionary rule withholds the constitutional imprimatur." *Terry v. Ohio,* 392 *U.S.* at 13, 88 *S.Ct.* at 1875, 20 *L.Ed.*2d at 901. The Court today fails to appreciate that "[t]he efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land." *Weeks v. United States,* 232 *U.S.* 383, 393, 34 *S.Ct.* 341, 344, 58 *L.Ed.* 652 (1914).

In addition to failing to heed "the imperative of judicial integrity," the Court also implicitly reaffirms its view in *Howery* that the deterrent purposes of the exclusionary rule in *Prouse* would not be furthered by even limited retrospective application. See *Howery,* 80 *N.J.* at 569. I continue to disagree. The Court's position disregards the fact that the exclusionary rule focuses on general rather than specific deterrence. Specific deterrence is the punishment of an individual so that he himself will not repeat the same behavior. But "[t]he justification for the exclusion of evidence obtained by improper methods is to motivate the law enforcement profession as a whole—not the aberrant individual officer—to adopt and enforce regular procedures that will avoid the future invasion of the citizen's constitutional rights." *Dunaway v. New York,* 442 *U.S.* 200, 221, 99 *S.Ct.* 2248, 2261, 60 *L.Ed.*2d 824, 841 (1979) (Stevens, J., concur-

ring). The exclusionary rule's "purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States*, 364 *U.S.* at 217, 80 *S.Ct.* at 1444, 4 *L.Ed.*2d at 1677. Limited retroactive effect of the rule of *Prouse* to cases on direct review would clearly serve this general deterrent effect.

When considering the second criterion for retroactivity—reliance on prior law—it is crucial to view that reliance from the proper perspective. Unlike the individual police officer, a law enforcement organization can be properly charged with foreseeing clearly developing constitutional principles· before they are explicitly applied as the law of a case. Responsibility for educating police in their behavior should rest on those officials with the ability to evaluate clearly developing constitutional principles. Ultimately they have the obligation in seeing that law enforcement techniques pass constitutional muster. Retrospective application of a foreshadowed rule of law would give these institutional law enforcement authorities the incentive to seek out and discontinue suspect practices. Accordingly, reliance on past law must be justifiable from the relatively objective standpoint of the law enforcement agency, not the subjective perspective of the individual officer.

> [I]t is very difficult to believe that * * * the retrospectivity of a Supreme Court decision can turn upon the subjective state of a particular searching officer's mind or upon the degree to which he may be sophisticated in reading Supreme Court opinions. If it did, the applicability of Supreme Court decisions in cases involving searches would be hopelessly conflicting and unpredictable. They are troublesome enough when we are obliged to deal only with the differing states of judges' minds on this complex subject. [*United States v. Escalante*, 554 *F.*2d 970, 975 (9th Cir. 1977) (*en banc*) (Hufstedler, J., dissenting), cert. den., 434 *U.S.* 862, 98 *S.Ct.* 192, 54 *L.Ed.*2d 136 (1977)]

At the time of the search involved in this case—November 13, 1976—the practice of random stops by police was indeed a highly suspect practice. *Brignoni-Ponce* had already forbidden such

stops in a highly analogous situation. By the time of the search, courts in other jurisdictions had held that the Fourth Amendment prohibits the kind of stop which occurred here. See *United States v. Nicholas*, 448 *F.*2d 622 (8th Cir. 1971); *State v. Ochoa*, 23 *Ariz.App.* 510, 534 *P.*2d 441 (Ct.App.1975), rev'd on other grounds, 112 *Ariz.* 582, 544 *P.*2d 1097 (Sup.Ct.1976); *People v. Whalen*, 390 *Mich.* 672, 213 *N.W.*2d 116 (Sup.Ct.1973); *People v. Ingle*, 36 *N.Y.*2d 413, 369 *N.Y.S.*2d 67, 330 *N.E.*2d 39 (Ct.App.1975); *Commonwealth v. Swanger*, 453 *Pa.* 107, 307 *A.* 2d 875 (Sup.Ct.1973); [8] see also *United States v. Cupps*, 503 *F.*2d 277 (6th Cir. 1974). Although not yet specifically forbidden in New Jersey, the practice was surely questionable. Refusing nonretroactive application of the exclusionary rule is an open invitation to law enforcement agencies to disregard developing constitutional norms in the future. By viewing changes in search and seizure doctrine as narrowly as possible, this approach will encourage law enforcement officials to view all civil liberties in the same narrow manner. See Note, "*A la Recherche du Temps Perdu* : Retroactivity and the Exclusionary Rule," 54 *N.Y.U.L.Rev.* 84, 106 (1979) [hereinafter "Retroactivity"].

In contrast, granting limited retrospective effect to extensions of exclusionary principles will give due regard to the concept of general deterrence which lies at the heart of the Fourth Amendment.

---

[8]Only two courts permitted arbitrary investigatory stops after *Brignoni-Ponce*. In one case, the Tenth Circuit Court of Appeals refused to reconsider a 1972 decision in the light of developments elsewhere. *United States v. Jenkins*, 528 *F.*2d 713, 714 (10th Cir. 1975). The other decisions came from the Nebraska Supreme Court, *State v. Shepardson*, 194 *Neb.* 673, 235 *N.W.*2d 218 (Sup.Ct.1975); *State v. Holmberg*, 194 *Neb.* 337, 231 *N.W.*2d 672 (Sup.Ct. 1975), and were later effectively repudiated by that court in *Kretchmar, supra* at 564 n. 7.

> By demonstrating that society will attach serious consequences to the violation
> of constitutional rights, the exclusionary rule invokes and magnifies the moral
> and the educative force of the law. Over the long term this may integrate some
> fourth amendment ideals into the value system or norms of behavior of law
> enforcement agencies. [Oaks, "Studying the Exclusionary Rule in Search and
> Seizure," 37 *U.Chi.L.Rev.* 665, 756 (1970)]

To give Fourth Amendment protections their intended meaning,
"[l]aw enforcement *agencies* must have an incentive to conform
their activities to clearly emerging developments in the law
*before* a court strikes down a practice  *  *  * . The threat of
retroactive application of at least *certain* newly recognized
exclusionary principles appears to be the only effective means,
at present, of instilling that incentive." "Retroactivity," *supra,*
54 *N.Y.U.L.Rev.* at 101 n. 82.

As for the third strand in the retroactivity analysis, it can
readily be perceived that the effect on the administration of
justice as to those few cases pending direct review would be
minimal. Such limited retrospective application would certainly
not inundate our lower courts with a deluge of petitions sup-
ported by "stale" evidence. See *Howery,* 80 *N.J.* at 582 583
(Pashman, J., dissenting).

### B

Each of the three factors in the retroactivity analysis of *Nash*
and *Howery*[9] militates in favor of limited retroactive applica-

---

[9]The three-part test itself has not been found to be an entirely satisfactory
solution. Former Chief Justice Traynor of the California Supreme Court has
stated that the test's

> inadequacy lies mainly in the failure to weigh against the [factors embod-
> ied in the three-part test] the hardship and inequity suffered by those who
> are denied the benefit of the new rule and compelled to bear the burden
> on what is now admittedly recognized as an unjust rule. [Traynor, "*Quo
> Vadis*, Prospective Overruling: A Question of Judicial Responsibility," 28
> *Hast.L.J.* 533, 561 (1977)]

To determine whether there should be only prospective application of a new
rule, Chief Justice Traynor would require

tion of the *Prouse* rule in this case. I also believe that a commitment to even-handed justice demands that all cases pending direct review be decided "in light of our best understanding of governing constitutional principles." *Mackey v. United States*, 401 *U.S.* 667, 679, 91 *S.Ct.* 1160, 1173, 28 *L.Ed.2d* 404 (1971) (Harlan, J., concurring and dissenting).

There is little wisdom and no fairness in "[s]imply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule * * *." *Id.* at 679, 91 *S.Ct.* at 1173, 28 *L.Ed.2d* at 412 (Harlan, J., concurring and dissenting). This form of prospective rulemaking which the Court adopts today awards vindication of personal rights only to the winner of a race to the courthouse. This approach has no place in constitutional adjudication. "Too many irrelevant considerations, including the common cold, bear upon the rate of progress of a case through the judicial system." Schaefer, "The Control of 'Sunbursts': Techniques of Prospective Overruling," 42 *N.Y.U. L.Rev.* 631, 645 (1967). The defendant in this case should not be deprived of the constitutional protection by the fortuitous event

clear demonstrations that a precedent must be overruled, that the new rule is the best of all possible replacements, and that the hardship on a party who has relied on the old rule outweighs the hardship on the party denied the benefit of the new rule. Since there are few cases where such rigorous demonstrations can be made, there should be few occasions when prospective overruling can justifiably displace the normal retroactive application of an overruling decision. [*Id.* at 561–562]

Similarly, Justice Harlan has maintained that the inquiry into the nature, purposes and scope of a particular constitutional rule is essential to determining whether that is the correct substantive rule of law.

That inquiry is, however, quite simply irrelevant in deciding, once a rule has been adopted as part of our legal fabric, which cases then pending in this Court should be governed by it. [*Mackey v. United States*, 401 *U.S.* 667, 681, 91 *S.Ct.* 1160, 1174, 28 *L.Ed.2d* 404 (1971) (Harlan, J., concurring and dissenting)]

that *Prouse* was decided while this case was still pending direct appellate review. The possible denial of relief from illegal imprisonment "on the basis of an arbitrary date raises a grave question of equal protection. If those whose cases were pending were reliably found guilty and hence did not deserve relief, the inequity remains that a few among them nonetheless did receive relief." Traynor, "*Quo Vadis*, Prospective Overruling: A Question of Judicial Responsibility," 28 *Hast.L.J.* 533, 559 (1977). There is thus a glaring inequity in affording relief to defendant Prouse, but denying relief to similarly situated defendants—including the defendant before us—who had not yet exhausted all avenues of direct review on the date that *Prouse* was decided.

In the recent case of *State v. Czachor*, 82 *N.J.* 392 (1980), Justice Handler, writing for the Court, implicitly recognized this basic inequity by deciding to give limited retroactive effect to the new "*Allen* charge" rule announced in that case. The "new" rule applied to all cases pending direct review on the date of the *Czachor* decision. Both the *Czachor* rule governing *Allen*-type charges and the exclusionary rule are based on " 'standards for criminal justice' which are designed to protect fundamental constitutional rights." *Id.* at 411 (Pashman, J., concurring). If concerns for fairness and judicial integrity moved the Court to require that the rule in *Czachor* be given limited retroactive effect, then I fail to understand why those concerns do not operate in this case.[10]

---

[10]*Czachor* is distinguishable from the exclusionary rule setting because that case places the factual accuracy of past jury verdicts in question. This difference, however, "would not mandate that only prospective effect be given to exclusionary rule decisions. If anything, it might require giving complete retroactive effect to cases such as [*Czachor*]." *State v. Czachor*, 82 *N.J.* at 412 (Pashman, J., concurring); see also *id.* at 411.

There are other compelling justifications for applying "new" constitutional rules to cases pending direct review. As Justice Harlan noted:

> Refusal to apply new constitutional rules to all cases arising on direct review may well substantially deter those whose financial resources are barely sufficient to withstand the costs of litigating to this Court, or attorneys who are willing to make sacrifices to perform their professional obligation in its broadest sense, from asserting rights bottomed on constitutional interpretations different from those currently prevailing in this Court. More importantly, it tends to cut this Court loose from the force of precedent, allowing us to restructure artificially those expectations legitimately created by extant law and thereby mitigate the practical force of stare decisis, * * * a force which ought properly to bear on the judicial resolution of any legal problem. * * *
>
> * * * I continue to believe that a proper perception of our duties as a court of law, charged with applying the Constitution to resolve every legal dispute within our jurisdiction on direct review, mandates that we apply the law as it is at the time, not as it once was. [*Mackey v. United States*, 401 *U.S.* at 680–681, 91 *S.Ct.* at 1174 (Harlan, J., concurring and dissenting) (citations omitted)]

Not only is applying the law "as it is" compelled by "the imperative of judicial integrity," but anything else is inconsistent with simple justice.

## III

Because "State Constitutions * * * are a font of individual liberties, their protections often extending beyond those required by the [United States] Supreme Court's interpretation of federal law," Brennan, "State Constitutions and the Protection of Individual Rights," 90 *Harv.L.Rev.* 489, 491 (1977); see, *e. g.*, *State v. Baker*, 81 *N.J.* 99, 112 (1979); *Oakwood at Madison Inc. v. Tp. of Madison*, 72 *N.J.* 481, 495 n. 3 (1977); *State v. Johnson*, 68 *N.J.* 349, 353 (1975), the Court should have at least discussed the issue of random police stops under our State Constitution as well as under the Fourth Amendment. I would hold that random police stops are forbidden by *N.J.Const.* (1947), Art. I,

par. 7, at least to the extent they are forbidden under the Fourth Amendment as interpreted in *Prouse*, and would give limited effect to this new ruling.

### IV

I believe that the only approach to retroactivity which comports with the judicial function is to apply our best understanding of the law to all cases which come before us. This requires that we apply "new" constitutional decisions in the exclusionary rule context to *all* cases pending direct review on the date when the "new" rule is announced. As Justice Harlan stated:

> If we do not resolve all cases before us on direct review in light of our best understanding of governing constitutional principles, it is difficult to see why we should so adjudicate any case at all.  *  *  *  In truth, the Court's assertion of power to disregard current law in adjudicating cases before us that have not already run the full course of appellate review, is quite simply an assertion that our constitutional function is not one of adjudication but in effect of legislation. We apply and definitively interpret the Constitution, under this view of our role, not because we are bound to, but only because we occasionally deem it appropriate, useful, or wise. That sort of choice may permissibly be made by a legislature or a council of revision, but not by a court of law. [*Mackey v. United States*, 401 *U.S.* at 679, 91 *S.Ct.* at 1173, 28 *L.Ed.2d* at 413 (Harlan, J., concurring and dissenting)]

Even if a rule forbidding random stops under *N.J.Const.* (1947), Art. I, par. 7, which should have been announced today, is not given limited retroactive effect, that State constitutional rule should nonetheless apply to this case. This would be so because even "new" constitutional rules are generally applied to the case in which that rule is first announced. See *Stovall v. Denno*, 388 *U.S.* at 301, 87 *S.Ct.* at 1972, 18 *L.Ed.2d* at 1206.

For the foregoing reasons, I believe that the judgment of the Appellate Division, reversing the conviction, should be affirmed.

Chief Justice WILENTZ and Justice SULLIVAN join in this dissenting opinion.

*For reversal and remandment*—Justices CLIFFORD, SCHREIBER, HANDLER and POLLOCK—4.

*For affirmance*—Chief Justice WILENTZ and Justices SULLIVAN and PASHMAN—3.